of Environmental Protection. Again, we have Mr. Stemplewitz for the petitions. Mr. Stemplewitz, we're confronted with an intriguing and unusual jurisdictional question here. I say unusual, I suppose for two reasons. First, it isn't the ordinary administrator review case where a panel of this court is reviewing a decision of a state agency. I also make that characterization because it's not usually the case for a petitioner who has brought a matter to our attention to then seek to out this jurisdiction. So perhaps we ought to begin by asking you to explain your position as to, well let me ask you this, of your petition. Why don't you just take a voluntary dismissal? I think that's a very good question. I thought so myself, and that's why I asked. And this was exactly the sort of situation that was confronted in the Berkshire case, which was decided five days after we filed our matter here. And I think the problem that arises is if you... In Berkshire, did they have a situation of dual filing there? I can't remember. I don't know off the top of my head. You chose not to dual file. Correct. We were directed by the public notice from the department that we file in the Third Circuit, which is what we did. We're hoping that ideally what this court would do would be to redirect this matter to the Environmental Healing Board. For what? Sorry? The ideal thing would be for what? To refer this to the Environmental Healing Board. How do we do that? I don't know if I have the specific citation. We remand to fora that have decided matters that have been appealed to us. Right. The state of Pennsylvania has a specific provision and there's case law providing a mechanism by which this court can... A legal lateral. Is that what you're suggesting? Sorry? A legal lateral of some kind. Something like that. Yes, Your Honor. Could you just withdraw your petition as suggested before and re-file a petition before the state agency? Yes, we could. And we could make the argument that we were directed to go to the wrong court and that therefore the 30-day requirement is waived and maybe get before the Environmental Healing Board that way. But the problem with that is if we do that, we're likely going to have Mr. Stodiak or somebody representing the Gas Pipeline Company go to Middle District Court of Pennsylvania and say that you're in the wrong court. But in effect, we can't make any kind of decision here because the matter is still before the Pennsylvania agency. Well, no. And the district court in the Middle District Court of Pennsylvania, Judge Mariani, essentially said, essentially directed this court, directed... It prevented the appeal of the Environmental Healing Board, our appeal of the Environmental Healing Board from going forward at that time. So we were precluded from continuing at the Environmental Healing Board. So what we need this court to decide is whether or not paid-ups action was final agency action and whether or not you have proper jurisdiction here. Okay. Well, let's move on to why you believe we do not have jurisdiction. I'm trying to harken back to the extent my memory is of some assistance to me to the Leidy line matter. Yes, sir. We exercised jurisdiction. Yes, you did, Your Honor. Are you asking us to overrule our determination? Well, I think if you look at the Berkshire case, it looks at Leidy and it looks at the underlying cases. And it finds that what the court relied on in that particular matter, the cases that it relied on, for example, Islander East, didn't really address the issue that the court said it addressed. But I think additionally, this is sort of a separate appeal. This is an appeal of the substantive Chapter 105 permits that were issued. Why don't we have jurisdiction here under 717F? Because there's no final agency action. And it is a longstanding rule described by the Pennsylvania Supreme Court, in other words, that you need to exhaust administrative revenues and have final agency action before appealing. What does 35 Pennsylvania annotated statutes, 7514C, say? And how does it speak to whether or not the state agency action here was final? I believe that, sorry, which specific? 7514C. 7514C. 7514C. No action of the department adversely affecting a person shall be final as to that person until the person has had the opportunity to appeal the action to the board under subsection G. If a person has not perfected an appeal in accordance with the regulations of the board, the department's action shall be final as to the person. You filed no action, right? That's correct. We have not because we were directed to file. So you've taken no appeal? We have taken no appeal to the Environmental Hearing Board, hoping that we would be directed back to that person. So why shouldn't we determine that under state law we have the final determination by the state agency? Because we're hoping that the Environmental Hearing Board would still agree to accept jurisdiction. Hope is a rather slender read. Yes, sir. We would apply. We would request that they exercise jurisdiction, and that court has in three separate opinions specifically expressed their opinion that they do have jurisdiction. I think it is likely that we would be granted. What is the alternative if they don't agree with you? Then we would be out of options for appeal. All right. Let's move beyond the jurisdictional question then. Your Honor, if I may add, this exact issue is briefed more thoroughly, I would add, in several other dockets pending before this circuit court. I at least know of one that we have before our court right now. I filed a brief yesterday. I think what's important here is, one, to focus on the facts, which were alluded to in 1506, which is that this is a single compressor station over one site, and it is apparent through. Before we get to those facts, and I do want to hear from you on that, but could you help us with a brief description of the contrast between the water dependency determination made for purposes of federal law and the water dependency determination made under state law? Yes, Your Honor. There is a meaningful distinction, at least on its face, isn't there? I don't think so. I think if you look at the Clean Streams Law, and if you look at 10518A specifically, you find different provisions and language that are exactly mirrored in the Clean Water Act. And the Clean Streams Law, Pennsylvania courts have established that the Clean Streams Law has similar goals, similar aims, and shared language. I mean, if you look at 10518A-3 and 10518A-B-3, you look at the practicability analysis, it's the same thing, cost, existing technology, and logistics. If you look at 10518B-3-I, the presumption of practicable alternatives is exactly the same. So does that provide the state with effectively a flexible approach to water dependency? In fact, isn't that what is codified in the code? No. Well, I think that the interpretations of the Clean Streams Law mirror how the Clean Water Act has been interpreted. And the Pennsylvania trout case is a really good example where you have the issue of basic project purpose. We were talking about that in 1506. That is exactly mirrored in the Clean Streams Law. All right. So what is the rule and the approach that the state agency was required to take here? Yes. So, yeah, and I think we should be laser focused on the specific part of the Pennsylvania code that's at issue here. And it's 10518A-2, which says, a project is water dependent when the project requires access or proximity to it, to or siting within a wetland to fulfill the basic purposes of the project. And, in other words, the department is prohibited from issuing a permit that crosses an exceptional value wetland, which we have a project that proposes a cross an exceptional value wetland here, if it is non-water dependent. And our position is this is the poster child of a project that is non-water dependent. Because you have no court in any jurisdiction has ever found a pipeline project or linear infrastructure generally to be water dependent. And I think that is a very important piece of the puzzle here. But also we have an alternative that requires, as we've seen by the record, no impacts to waters. So the basic purpose of this project, the basic purpose of a pipeline is getting gas from, or sorry, the basic purpose of this project is to get gas from point A to point B. You don't need a pipeline. You can do it by truck. You can do it by other pipelines, existing pipelines. You can do it by rail. And you can do it by compressor stations. And furthermore, the pipeline itself, you can build a pipeline in a desert. You don't need water siting or access to water for the basic purpose of a project. Again, I go back to 105.18.A.2 to fulfill the basic purposes of the project. And the basic purpose of the project is to move natural gas from one place to another. There was an agency determination that this was a water dependent project, wasn't there? There was a determination that this was water dependent. By the Army Corps? The Corps of Engineers never made a determination regarding water dependency, but they presumed it to be water dependent. And that's why those presumptions arose that there is a practicable alternative. That's why the presumptions arose that they had to demonstrate via clear and convincing evidence that the practicable alternative was not practicable. And, again, this same analysis arises here because the same provisions exist under the Clean Streams Law. But PADEP seems to have made a different determination, finding that this is a water dependent project. And they do so on the basis that, well, this project has to cross wetlands in order – the pipeline, the pipeline looping has to cross wetlands at some point in order to be built, right? But that sort of reasoning has been rejected. The purpose, of course, is to move gas from point A to point B. Now, you don't need water to do that, I assume. That's correct. That's exactly correct. Is that your position, why this is not water dependent? That's one of – yes, that's one of the reasons. That's exactly right. And I think it's important to understand that, in addition to that, there's the compression alternative. But wasn't – I understand that's your position, but wasn't DEP's position, or at least their observation, that – I think this is their line – which linear infrastructure projects of any significant length proposed in Pennsylvania will encounter surface waters, including wetlands? Why is that wrong? Yes, so there are numerous federal cases examining this exact issue. We have no Pennsylvania case law examining this issue, but we do have federal case law. And the federal case law is very clear. For example, building a highway or building a road. And I forget – I can't remember the name of the case off the top of my head. But basically, the court found that you have a road that necessarily needed to cross waterways and streams and things of that nature to complete the project. But it wasn't water dependent because it's a road. Roads do not require access or proximity to water, generally, as to fill the basic needs of the country. But was DEP applying federal law or state law in this instance? I think they're applying state law. I think that's 100 percent correct. But there are no cases – and both parties here have acknowledged – that there are no cases analyzing the application of 10518A2 to pipelines generally – sorry, pipelines specifically or linear infrastructure generally. And in such situations, because the Clean Water Act has such clear parallel provisions, Pennsylvania courts have specifically looked to the Clean Water Act as interpreted to inform their analysis. Have looked to inform their analysis. Yes. You're not suggesting, however, that they are bound by that, are you? No. No, I'm not. Very good. Thank you. We'll have you back. Well, let me ask Judge Nygaard, do you have any questions of Mr. Semplewicz before he returns on the rebuttal? No. Once again, my questions have been asked and answered. Thank you. Thank you very much. We'll have you back on rebuttal. Thank you, Your Honor. Good morning. Good morning. My name is Joe Segan. I represent the Commonwealth of Pennsylvania Department of Environmental Protection and its Secretary, Patrick McDonald. May it please the Court. This case is about the Department's authority to interpret its own regulations in choosing the least environmentally detrimental alternative. It is, assuming we cross the jurisdictional threshold, right? Yes, Your Honor. So let's talk about that first. We exercised jurisdiction in the LIDI line matter. Would you agree we did not address the finality issue that has been raised here in that case? Not in the opinion, Your Honor. That's correct. And in that matter, we have two of the same parties, the Department and the Riverkeeper, and the Department did oppose the Court's jurisdiction in the LIDI matter. Would you agree that 717R requires some kind of finality for us to be able to review an order? Well, that provision does state that an action or determination of the Department is not final, administratively final, until there's opportunity for hearing before the Environmental Hearing Board. Okay. So do we have a final order here from the ADEP? We have a final decision from the Department, but the action itself is not administratively final. Could you give us an idea of the timeline that you're working with? Let me take that back and add a clarifying point, Your Honor. Here, in this case, we do have a final action because the Riverkeeper has not pursued appeal before the Environmental Hearing Board. All right. I thought that's what you meant. Yes. And excuse me for not mentioning that beforehand. I mean, this is not our first time dealing with these issues. In the LIDI matter, the Riverkeeper did, in fact, file an appeal with the Environmental Hearing Board and that appeal was stayed by the board during the pendency of the challenge before this court. And even previously. So you would agree that under 35PA, statute annotated 7514C, that we've got a final determination here? Yes, Your Honor. And the issue of finality had also been addressed by the Federal District Court, to which the Riverkeeper and the Department was a party as an intervener where the court determined that it was not necessary, particularly for the court to have an administratively final action before a federal court review. Would you address your timeliness argument here? The timeliness argument concerning the 401 Water Quality Certification? The Riverkeeper here challenges the Department's issuance of a 401 Water Quality Certification in certain state permits that were required as conditions of the Water Quality Certification. Since the Water Quality Certification was issued last fall, notice of that was published last fall and no challenge was filed. Is there a 60-day period to challenge that? It's a 30-day period under state law, under the Pennsylvania Clean Streams Law, the Dam Safety and Encroachments Act, and the implementing regulations concerning procedures before the Environmental Hearing Board. But that is state law? Yes, Your Honor. Are we bound to apply a state law period for purposes of determining finality and jurisdiction in this case? Well, I think as default it would be appropriate since the Natural Gas Act is silent as to the issue. All right. The Riverkeeper acknowledges that the core of its challenge is to the Department's determination that the O-Line Pipeline Project is water dependent. The Department's interpretation of its own regulations is entitled to deference, and the Riverkeeper here has not established that that determination is arbitrary and incapricious. What differences are there between a determination for water dependency under state law as opposed to water dependency for purposes of the case that was previously argued here this morning and for which you were present but not a participant? Your Honor, there are significant differences between the federal and state regulatory scheme. The Department obviously has not been delegated authority to administer the 404 program since we've heard the case challenging the 404 permit. The Department's regulations are not reviewed or commented on by the federal agencies. While the term water dependency appears in both regulations, the consequence in how that analysis occurs is substantially different. At the time, Section 105.18.A.2 of the Department's regulations was adopted. In that regulatory package, the agency expressed the intent that linear infrastructure projects, such as roads, could be determined to be water dependent on a case-by-case basis. So is it a fair characterization of the Pennsylvania approach to call it flexible? Well, I would say it's more flexible than the federal approach. However, the intent expressed concerning 105.18.A.2 is also reflected in the Department's regulations at 105.14.B.7. Is that the regulation that came about in 1991? I seem to recall there was some kind of change in the regulatory scheme. Yes, Your Honor. At that time, 105.18.A.2 was adopted as well as 105.14.B.7, I believe. All right. Something else that is, shall I say, different in this case is that we sit here as a federal court asking ourselves, first of all, do we give the same kind of deference to a state agency determination as we would a federal agency determination? I don't know of any law on that question. Do you? Not specifically on that point, but I think there is case law, and the Department refers to the Chevron case and has identified federal court cases that give deference to the federal agencies, and I think they would be similarly applicable here. Well, we also have our deference, AUER. Do you know if there is any equivalent or any comparable type of deference in Pennsylvania jurisprudence? In Pennsylvania jurisprudence, there is deference to the agency's interpretation of its own regulations. Should we take into account concerns of federalism in reaching the threshold determination as to what kind of deference we ought to show a state agency? Well, I think the cases that the agency cited would be equally applicable, and the analysis is similar in regards to giving the agency deference. All right, so with that in mind, whatever degree of deference is called for, we know that the Army Corps explicitly mentioned compression in its alternative analysis. You did not here. Is there anywhere in the administrative record that it would be apparent to us that the state agency actually considered compression? Well, the compression alternative is proposed in the application that the agency reviewed in the alternatives analysis, and in the agency's environmental record, there is specific reference in the alternatives analysis portion, which I believe is JA45 and JA176, and also under its water dependency determination, where it refers to the section of the application concerning system alternatives, which the compression alternative and ultra-looping alternatives were considered. And what was the decision? Disconsidered? The ultimate determination concerning the alternatives analysis, it was decided that the least environmentally detrimental alternative was the co-location alternative, providing for over 99 percent of the proposed pipeline to be within or adjacent to existing pipeline and existing utility rights of way. And as other council have argued, and it's echoed in the department's logic and rationale reflected in the record, it was driven primarily by the fact that the co-location alternative resulted in temporary impacts to wetland resources and that the compression alternative resulted in permanent environmental impacts. Ultimately, at the conclusion of this project, all wetland resources will be restored to original contour, and any wetlands encountered by the project classified as exceptional value under state law will continue to hold that classification after the project has been concluded. I see your time is up. I just want to ask you a quick question. You were asked before about whether there's a difference between the federal and state law with regard to water dependency. Did the state make a decision in this case as to whether the pipeline loop project was water dependent or not? Yes. And what was that? The department determined that the pipeline project was water dependent. And it was water dependent because? It was water dependent because by necessity, if you're going to be transporting a linear infrastructure project of this nature, whether you're transporting gas, water, or sewage, is going to encounter wetlands, and that's inevitable. And because after evaluating all alternatives. It's dependent on water because it has to go through it? Well, because it's consistent with the intention that was expressed when 105-18-82 was adopted and the fact that the department's regulations at 105-14-B-6 reflect that intention and that water dependency can be based on a lack of available alternatives that are less environmentally detrimental. Yes, that is the way the department views linear infrastructure projects. As the Riverkeeper has pointed out, a number of federal case law that stand for its assertions that the federal courts have universally found that roads are not water dependent. At the time the department adopted the regulation at issue, the department expressly stated that roads can be demonstrated to be water dependent, dependent upon location. Thank you. I made that reference earlier in one of my questions. Let me ask you another question about state law or the comparability of state law with federal law. The federal regulations, as you know, require commensurate review. We're talking about projects with minor environmental impact. Does Pennsylvania have any similar concept to commensurate review? I'm not sure if I exactly understand what you're referring to. The department did a specific review based on the alternatives presented and exercised its judgment in evaluating those reviews. There is no other principle whereby we would not use commensurate review. Commensurate review is a principle under federal regulations, and I was just curious as to whether or not there was some similar principle in Pennsylvania law. If there isn't or if you don't know, it's not critical. I'm not prepared to speak on that today, Your Honor. Thank you very much. Now, Judge, can I guard any questions? No, thank you. Thank you very much. Thank you. Thank you very much. Mr. Stobiak. Thank you again. May it please the Court, I'm John Stobiak for the Intervenor Tennessee Gas Pipeline. Let me briefly speak to jurisdiction, and then I want to cover the two-compressor, one-compressor issue here in the process. This Court has ruled in the Leidy case, Delaware Riverkeeper v. DEP, an opinion by Judge Roth, consistent with the language of 717RD1 of the Natural Gas Act, that courts of appeals have original and exclusive jurisdiction to review actions undertaken by a state administrative agency pursuant to federal law. All those elements are met here. But you agree we did not deal expressly with the issue of finality. You did not, but you don't need to, as Judge Mariani found, because the next element is pursuant to federal law to issue, condition, or deny a permit, license, concurrence, or approval. Here you have the permits that have been issued. There's no dispute about that. And in addition, we have the benefit they are final in anybody's interpretation because there was no appeal to the Environmental Hearing Board. But you also have finality in a very real sense, which is different than what happens in the Berkshire case, where you have an internal administrative process. When that permit issued and we had approval to proceed with work, with a notice to proceed, we started construction of the pipeline, of the loops that were involved here, the 12.9 miles of co-located loops. Riverkeeper knew that that was final because they came in and tried to get an emergency stay to stop it. Everybody recognized that they were final. I don't know what else finality would mean, but we're doing work under the permits and they're opposing it and seeking emergency relief. So I think finality has occurred as of the date of the issuance of the permit. I think that's consistent with the language of the Natural Gas Act, as Judge Mariani found it in the case that we brought before him, seeking an injunction which he granted in the Middle District. So that's the first piece. I want to take a second, really, to talk about the two versus one compressor stations because I think there's really been a lot of misunderstanding about it or misdiscussion. And I want to refer to the exact language, and I'm referring to JA318. This language appears in the Resource Report 10 and also appears in the Joint Application. Tennessee evaluated two compression options for the project that involved the construction of new perennial greenfield compressor stations, PERL. And then it goes on and says, Tennessee noted that adding a new greenfield compressor station would require Tennessee to obtain approximately 40 acres per site, total of 80 acres. And then it goes on to describe the impacts of that. They would install permanent access roads, fencing buildings, and other necessary equipment. Ordinarily, how do you do that? You have to find the correct location for the compressor station? Yes. I assume somebody else owns that land? You'd have to go and condemn it if you had that option, if you wanted to do that. And you'd have to do a lot of field work. Now, if you look at J405, you can see that there were two compressor stations for everybody here. So for Riverkeeper to argue, as it's done in both these appeals, that this was really one compressor station and really not even make those arguments in their comments is sort of like an administrative gotcha type of thing. It was very clear on the record that there were two compressor stations here as the alternative there that was considered. Now, in terms of, I'd like you to take a moment when you get a chance to look at another figure that's in color in our attachments, JA249, which is a project overview map of the Tennessee gas pipeline. The basic purpose of this project is to go from one point, which is the receiving point, to the exit point. Now, if you look at paragraph three of the certificate order, it specifies exactly what the purpose is. It's not to just create looping. It's to go from one point, specific point A, to point B in the right-of-way. And if you look at this Google map, you will see that if you're going to go from point A to point B, you inevitably, as Mr. Sagan said, are going to have to cross wetlands, waterways. It's a heavy waterway, wetland area in that part of Pennsylvania. So unless you're going to abandon that right-of-way, it's already there, there's already a pipeline in it, you're going to cross waterways, which is why he thinks it's water-dependent, why the department determined it was water-dependent. So that's the second point. In terms of federalism questions, I think based upon the language in Chevron and Justice Scalia's language in Auer, this court can apply a deference if he thinks it's reasonable. And your sort of touchstone of reasonableness is the exact same argument about water dependency was made by Riverkeeper with Mr. Stemplowitz in a supersedious hearing before the Environmental Hearing Board involving a state pipeline, not an interstate pipeline, Mariner East, a PUC-approved one. And that argument was rebutted by the Commonwealth, by the Department of Environmental Protection, making the same arguments they've made here. And Judge Loboskis, one of the Environmental Hearing Board judges, said, I'm inclined to accept their argument, as is quoted in the brief. And I think the board as a whole, because they act as a board as opposed to one judge, I think they're inclined to find with me. So I think you have a touchstone that gets you so you're not crossing any far-reaching lines in doing that. The last thing is the standard here in the Third Circuit is arbitrary and capricious, but there was nice language in the NBE Inc. case a while ago that you have to affirm the action unless it was irrational or not based upon relevant factors. Judge Fuentes was on that panel. And I think clearly you've heard from the Army Corps and you've heard from the EADEP, these actions were rational in terms of selecting a project and approving a project that's going to have temporary and minor impacts. Thank you. Thank you very much, Mr. Stowiak. Mr. Samowitz, you have rebuttal. Thank you, Your Honor. It's astonishing to me that the project applicant is asserting that this project requires two different compressor stations. If you look at the record that was before the Department, the application clearly states, using an iterative process of locating the new station at various points downstream, Tennessee then selects the location, singular. It's repeatedly referred to in the singular there. I understand also in the draft environmental assessment, it clearly states that to achieve the project objectives, we identified a possible compression alternative which would involve the development of a new compressor station requiring approximately 40 acres of new greenfield construction. Two potential sites were identified. There's no question that this was one site. And there's also no question that the Department considered two sites when they were evaluating the compression alternative. They were under the impression that this was two sites. And that consideration, therefore, the consideration of the compression alternative is irrational because they didn't understand the basic fundamental size of the compression alternative. And they based their decision explicitly, based on the briefing, on that size of it being two compressor stations. I think it's also important to consider that Mr. Stowiak showed you a picture of where this pipeline looping is going and it's crossing waterways and wetlands. What he didn't mention to you is that the company that he represents commonly uses HDD, which is horizontal direct drilling underneath watercourses and roads and highways frequently. If they wanted to, they could HDD under every one of these watercourses if they wanted to. They do it under almost every road. They could easily do it under all of these water resources. So there's no way that a pipeline project could possibly be considered water dependent because not only do you have the possibility of HDD, but you have the compression alternative, which doesn't even require any impacts to waterways. And I think those things are very, very important to understand. Additionally, I want to address Judge Loboskis' opinion in the Sunoco matter. In that case, there was no compression alternative. And secondly, that issue wasn't fully briefed before him. It was an opinion on a supersedes, and I would submit that when this issue is fully briefed on summary judgment, there will be a better understanding of the law and of the requirements under 10518A2. Also, with regard to deference, the Third Circuit is pretty clear that the Third Circuit has recognized that, quote, interpretations such as those in opinion letters, like interpretations contained in policy statements, agency manuals, enforcement guidelines, all of which lack the force of law, do not warrant Chevron deference. And that's all that the Department has to go on here is this policy statement from 1991 that has never been interpreted by any court. And furthermore, the United States Supreme Court has said that agencies should only be provided deference, at least our deference, proportional to its power to persuade. And I don't believe that the Department's position here is persuasive, and that's our position. Thank you very much, Mr. Semplewitz. The panel expresses its thanks to all of counsel. In both of the cases we've heard argument on this morning, well briefed, well argued, I am going to ask that transcripts of both oral arguments be prepared, and the panel then will take the matters under advisement.